O 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | FILED<br>CLERK U.S. DISTRICT COURT<br>CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

**FILED**
CLERK U.S. DISTRICT COURT

MAY – 8 2019

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

| UNITED STATES OF AMERICA<br>v.<br>ANDRY PAULINO, a.k.a. "Roberto Diaz" | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>19MJ01944 |
|---|---|

Complaint for violation of Title 18, United States Code, Sections 1349 and 1028A

| NAME OF MAGISTRATE JUDGE<br>Honorable John E. McDermott | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>2017 through the present | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

**See Attachment**

LODGED
2019 MAY –8 AM 10:46
CLERK U.S. DISTRICT COURT
CENT. DIST. OF CALIF.
LOS ANGELES

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Sherine Ebadi |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, FBI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1]<br>JOHN E. McDERMOTT | DATE<br>May 8, 2019 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Andrew Brown, 11th floor, x0102     DETENTION     Warrant

**Attachment**

## Count One (18 U.S.C. § 1349)

Beginning in or before 2017, and continuing through at least May 8, 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendant ANDRY PAULINO, a.k.a. "Roberto Diaz" ("defendant"), and others, conspired to commit bank fraud, in violation of Title 18, United States Code, Section 1344. The object of the conspiracy was carried out, and to be carried out, in substance, as follows: Defendant and his co-conspirators would purchase credit and debit card account numbers issued by federally insured banks that actually belonged to victims of identity theft, and would produce counterfeit debit and credit cards using that information, which they would use to make purchases, including of money orders. Defendant's co-conspirators would send him money orders purchased with the stolen account numbers, which defendant would negotiate using a false name. Defendant would then use the cash proceeds to purchase Bitcoin to send to his co-conspirators their share of the proceeds of the fraud. Federally-insured financial institutions defrauded out of millions of dollars as a result of this conspiracy include Wells Fargo, Chase, Navy Federal Credit Union, U.S. Bank, PNC Bank, Bancorp, and Bank of America.

## Count Two (18 U.S.C. § 1028A)

Beginning in or before 2017, and continuing through at least May 8, 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendant ANDRY PAULINO, a.k.a. "Roberto Diaz," knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person during and in relation to a felony violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Bank Fraud, as charged in Count One, knowing that the means of identification belonged to another actual person.

A F F I D A V I T

I, Sherine D. Ebadi, being duly sworn and under oath, hereby depose and say as follows:

**INTRODUCTION**

1.    I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") assigned to the Long Beach Resident Agency of the Los Angeles Division.  I have been employed with the FBI as an SA since 2009.  I am currently assigned to the White Collar Crimes Squad, where I specialize in the investigation of complex financial crimes, including bank fraud, wire fraud, identity theft, investment fraud, securities fraud, and money laundering.  In addition to conducting numerous fraud investigations during my career, I have received both formal and informal training from the FBI and other entities regarding violations of various fraud statutes.

**PURPOSE OF AFFIDAVIT: ARRESTS AND SEARCH WARRANTS**

2.    This affidavit is made in support of a criminal complaint against and arrest warrant for ANDRY PAULINO, also known as Roberto Diaz ("PAULINO"), for conspiracy to commit bank fraud and aggravated identity theft, in violation of Title 18, United States Code, Sections 1349 and 1028A.  This affidavit is also made in support of search warrants for PAULINO's person, residence, and vehicle for evidence of the same violations as well as wire fraud and money laundering, as set forth in Attachment B.

3.    The information set forth in this affidavit is based upon my participation in the investigation, encompassing my personal knowledge, observations and experience, as well as information obtained through my review of evidence, investigative reports, and information provided by others, including other law enforcement

partners.  As this affidavit is being submitted for the limited purpose of securing the requested warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrants.

**PREMISES TO BE SEARCHED**

4.   The premises to be searched (collectively, the "SUBJECT PREMISES") are described as follows:

a.   ANDRY PAULINO, date of birth March 14, 1991 is approximately 6 feet tall, medium build, with black hair and brown eyes.  PAULINO is further identified by his California driver's license number Y2727506 and United States passport number 585268295.  PAULINO utilizes the alias of Roberto Diaz.  PAULINO also utilizes the date of birth December 24, 1990 and California driver's license F5288631 for his alias.  PAULINO may be using additional aliases such as Manuel Rivera, George Rodriguez, Carlos Gomes, Randy Perez, Julio Reyes, Val Bundy, or Al Ruiz.

b.   APARTMENT 7006 AND PARKING SPACE 906, THE ORSINI APARTMENT COMPLEX, 550 N. FIGUEROA ST., LOS ANGELES, CALIFORNIA 90012 ("PAULINO'S APARTMENT").  PAULINO'S APARTMENT is located in the Orsini Phase II building located on the east side of Figueroa St. just south of Sunset Blvd.  PAULINO'S APARTMENT is further identified by the numbers "7006" in black numbering affixed to the wall on the right side of the apartment's entry door.  The exterior of the building housing PAULINO'S APARTMENT is tan/beige in color with dark colored metal railing on the balconies.  The exterior of the building is further marked with the letters "550" and a sign which reads "ORSINI".  The bottom portion of the building is red brick.  The

2

1  premises to be searched includes the vehicle in the assigned parking
2  space for PAULINO'S APARTMENT, which is located on the upper level of
3  a two-level subterranean parking garage and is entered through a
4  gated driveway located on the east side of Figueroa St., just south
5  of Sunset Blvd.  PAULINO's parking space is further identified with
6  the numbers "906" painted on the ground.
7       c.   THE BLACK HONDA 4-DOOR SEDAN WITH CALIFORNIA LICENSE
8  PLATE 7RRJ847 ("PAULINO'S VEHICLE").
9                 **PAULINO'S MONEY ORDER FRAUD SCHEME**
10 PAULINO's Cashed Almost $1.4 Million in Money Orders Using an Alias
11      5.   Between at least January 30, 2017 and August 1, 2018,
12 approximately $1.396 million in money orders made payable to "Roberto
13 Diaz" were cashed.  At least $465,830 of these money orders were
14 purchased from Western Union ("WU"), at least $610,139 were purchased
15 from MoneyGram ("MG") and at least $320,075 were purchased from the
16 United States Postal Service ("USPS") (Collectively known as "The
17 Diaz Money Orders").  I reviewed documentation received from MG which
18 revealed that the money orders were purchased at locations across the
19 United States to include Illinois, Indiana, Michigan, California,
20 Virginia, Maryland, Pennsylvania, and Ohio.  I reviewed information
21 received from USPS which revealed the money orders were purchased at
22 locations across the United States to include Illinois, Indiana,
23 Michigan, Georgia, and Washington, DC.  Information on purchase
24 location has not yet been received from WU.
25      6.   All but $30,505 of The Diaz Money Orders were cashed at
26 check cashing businesses in Canoga Park, Sherman Oaks, and Los
27 Angeles.  I reviewed surveillance photographs and documentation
28 obtained from the check cashing businesses in Canoga Park, Sherman

                                  3

1    Oaks and Los Angeles which showed that PAULINO was the individual who
2    cashed these money orders.  PAULINO provided a falsified California
3    driver's license in the name of Roberto Diaz with PAULINO's
4    photograph but number F5288631 and date of birth December 24, 1990.
5    According to the California Department of Motor Vehicles ("DMV"),
6    driver's license number F5288631 is assigned to a female hereby
7    identified as "J.H.".  My partner interviewed JH and learned that she
8    did not know PAULINO, aka Diaz, and did not give him or anyone else
9    authority to utilize her driver's license number.

10        7.   Surveillance photographs from the check cashing business in
11   Canoga Park further showed that on at least one occasion, PAULINO
12   drove to the check cashing location in a black colored Honda sedan
13   with California license plate number 7RRJ847.  According to the DMV,
14   this vehicle is registered to PAULINO ("PAULINO's VEHICLE").

15        8.   Between August 20, 2018 and December 8, 2018, pursuant to
16   an authorized search warrant, the Los Angeles Police Department
17   ("LAPD") installed a GPS tracker on PAULINO's VEHICLE.  During this
18   period of time, PAULINO's VEHICLE was observed at MG, USPS and WU
19   locations in and around Los Angeles.  In addition, PAULINO's VEHICLE
20   was observed at a commercial mail service business called Mail
21   Monster located at 941 S. Vermont Ave., Los Angeles, California.

22        9.   I reviewed documents received from Mail Monster which
23   revealed that mailbox #34 was maintained by "Roberto Diaz".  A copy
24   of the fraudulent California driver's license F5288631 in the name of
25   Roberto Diaz, but with PAULINO's picture was provided to Mail Monster
26   with a mailbox application.  On the mailbox application, "Diaz"
27   provided a date of birth December 24, 1990.

28

4

<u>Stolen Debit Cards Were Used to Purchase Diaz's Money Orders</u>

**Roanoke County Police Department**

10.   I reviewed documents received from Roanoke County Police Department in Virginia which showed that on December 7, 2017, victim "K.W.'s" debit card information was used without K.W.'s knowledge and/or consent to purchase six money orders: four for $1,000 each with serial numbers 50739089376, 50739089387, 24744329087, and 24744329076; one for $950 with serial number 24744329043; and one for $990 with serial number 24744329098 for a total of $5,940. These money orders were purchased from a USPS in Paxtonville, Pennsylvania and were made payable to "Roberto Diaz".

11.   Per Detective Van Patten of the Roanoke County Police Department, Inspector Melissa McAlister of the USPS provided information that the six money orders purchased with K.W.'s stolen credit card were cashed by "Roberto Diaz" at a check cashing store in Canoga Park, California.

**Navy Federal Credit Union**

12.   I reviewed documents received from Navy Federal Credit Union ("NFCU") which showed that on March 10, 2018 victim "M.G.'s" personal identifying information ("PII") was used to obtain a $30,000 loan. On that same day, an unknown individual identified as a "light skinned, black male" went to the NFCU branch in Stockbridge, Georgia, showed a Florida driver's license number G650557821730 in M.G.'s name and withdrew the $30,000 from M.G.'s loan. The individual took $10,000 in cash and used $20,000 to open account ending in X5483 at NFCU. On March 13, 2018, the debit card associated with account X5483 was used to make a purchase at a USPS location in Decatur,

Georgia for $2,904.95 and at a USPS location in Atlanta, Georgia for $1,001.65.

13.   I reviewed information provided by USPS Inspector Christopher Zito which showed that on March 12-13, 2018, victim M.G.'s stolen debit card was used to purchase five money orders at USPS locations in Decatur and Atlanta, Georgia: four for $1,000 each with serial numbers 24918858628, 24918858617, 25060605276, and 25060605265; and one for $900 with serial number 24918858630 for a total of $4,900.  These money orders were made payable to "Roberto Diaz" and were cashed at a check cashing store in Canoga Park.

**Mount Prospect Police Department**

14.   I reviewed information provided by Mount Prospect Police Department which showed on July 5, 2018, victim "A.B.'s" debit card information was used without his knowledge and/or authorization to purchase two MG money orders from a Walmart in Mount Prospect, Illinois.  Per Detective Mavranganis of Mount Prospect Police Department, the money orders purchased were for $1,000 and $300 with serial numbers 20805511885 and 20805511886.  These money orders were subsequently cashed by "Roberto Diaz" at a check cashing location in Canoga Park on July 9, 2018.

15.   On July 6, 2018, victim "K.M.'s" debit card information was used without her knowledge and/or authorization to purchase three MG money orders from a Walmart in Mount Prospect, Illinois.  Per Detective Mavranganis, two of the money orders purchased were for $1,000 and one was for $900, further identified by serial numbers 20805511906, 20805511907 and 20805511908.  These money orders were subsequently cashed by "Roberto Diaz" at a check cashing location in Canoga Park.

**PAULINO'S IDENTITY THEFT AND CREDIT CARD FRAUD SCHEMES**

State Search Warrant at PAULINO's APARTMENT Reveals Evidence of Fraud

16. On April 3, 2019, pursuant to an authorized search warrant, Detectives from the LAPD executed search warrants on PAULINO'S APARTMENT, person, and PAULINO'S VEHICLE. Items seized during that search warrant indicate PAULINO and others were involved in identity theft and credit card fraud schemes, as described below.

17. Among the items seized was PAULINO's wallet which contained four re-encoded credit cards each of which showed PAULINO's name and a 16-digit account number on the front of the card which did not match the name and 16-digit account number on the magnetic strip.

18. Notably, several months earlier, on October 25, 2018, PAULINO was arrested by the Los Angeles County Sheriff's Department ("LASD") for possessing re-encoded credit cards, in violation of Penal Code section 484 e(d) (Unauthorized Use of an Access Card). According to LASD reports I reviewed, PAULINO provided a credit card which had PAULINO's name and a card number ending in #9409 embossed on the front of the card to purchase the ticket to Universal Studios. The teller noted that the receipt for the transaction showed a card number ending in #0715, which did not match the number embossed on the front of the card. The teller notified LASD. LASD Deputies confirmed the information on the magnetic strip of the card did not match the name and number embossed on the outside of the card. Incident to arrest, Deputies searched PAULINO and found an additional card in PAULINO's wallet which had PAULINO's name and an account number embossed on the outside of the card which did not match the name and account number on the magnetic strip. PAULINO was later

1   released on bond in this matter and is scheduled to appear in Los
2   Angeles Superior Court on May 14, 2019.

3       19.   Also seized during LAPD's search of PAULINO's home on April
4   3, 2019, was approximately $86,000 in cash, four cellular telephones
5   and a .40 caliber Glock pistol which was reported stolen out of
6   Houston, Texas.

7   PAULINO Admitted to the Fraud

8       20.   During the execution of the LAPD search warrant on April 3,
9   2019, I interviewed PAULINO.  PAULINO was provided with his Miranda
10  Rights which he waived and made the following statements:

11      a.   PAULINO utilizes the alias Roberto Diaz and maintains
12  a mailbox in Diaz's name at Mail Monster located at 941 S. Vermont
13  #34, Los Angeles, California.

14      b.   PAULINO received money orders in the name of Diaz from
15  co-conspirators sometimes via mail to Mail Monster and sometimes in
16  person.  PAULINO cashed the money orders and kept approximately 20%
17  of the proceeds for himself.  PAULINO transferred the remaining 80%
18  of the proceeds to his co-conspirators via Bitcoin.  PAULINO's co-
19  conspirators send him their Bitcoin wallet addresses which were
20  usually composed of 30 alpha numeric character strings.

21      c.   PAULINO has not had any employment or source of income
22  for approximately 4 years since he left New York.

23      d.   The approximately $86,000 in cash, the four cellular
24  telephones and the Glock 22 seized by the LAPD belonged to PAULINO.
25  PAULINO stated the Glock 22 was not registered and that he had
26  purchased it from someone he found on Craigslist in Arizona and later
27  brought it to California.

28  PAULINO's Cellular Telephones Revealed Additional Evidence of Fraud

21.   Pursuant to the LAPD search warrant, Detectives from the LAPD and I reviewed PAULINO's four cellular telephones and uncovered additional evidence of PAULINO's fraud schemes.

22.   Found in the "Notes" section of one of PAULINO's phones was a list of names and addresses including:

Roberto Diaz 180 S. Western Ave. #52, Los Angeles

Roberto Diaz 941 S. Vermont Ave. #101-34, Los Angeles

Randy Perez 16060 Ventura Blvd. #110-327, Encino

Carlos Gomez 11693 San Vicente #497, Los Angeles

Manuel Rivera 115 W. California #251, Pasadena

George Rodriguez 2245 E. Colorado #104-179, Pasadena

23.   Each of these addresses correspond to a mail box service business as described below:

a.   I reviewed information provided by the Koko Group for a mailbox located at 180 S. Western Ave. #52, Los Angeles, California which was assigned to Roberto Diaz, phone number (747)300-6259 and email address drep314@gmail.com.

b.   I reviewed information provided by Mail Monster for a mailbox located at 941 S. Vermont Ave. #101-34, Los Angeles, California which was assigned to Roberto Diaz, California driver's license number F5288631 and telephone number (747)300-6259.

c.   I reviewed information provided by Post Pack & Ship for a mailbox located at 115 W. California #251, Pasadena, California which was assigned to Manuel Rivera, Illinois driver's license L32029388601, phone number (747)300-6259 and email address drep314@gmail.com.   A copy of "Rivera's" driver's license showed a picture of PAULINO with the name "Manuel Rivera" and date of birth June 13, 1991.   I noted that the phone number and email address

1   provided to Post Pack & Ship for "Manuel Rivera" were the same as the
2   phone number and email address provided to the Koko Group for
3   "Roberto Diaz".

4          d.   I reviewed information provided by The Postmaster for
5   a mailbox located at 2245 E. Colorado Ave. #104-179, Pasadena,
6   California which was assigned to George Rodriguez, Illinois driver's
7   license L320293886010 and phone number (747)300-6259. The Postmaster
8   did not have a copy of Rodriguez's driver's license, however, I noted
9   that the Illinois driver's license number provided to The Postmaster
10  for "George Rodriguez" was the same number provided to Post Pack &
11  Ship for "Manuel Rivera". In addition, the phone number provided to
12  The Postmaster for "George Rodriguez" was the same as the phone
13  number provided to The Koko Group and Mail Monster for "Roberto Diaz"
14  and to Post Pack & Ship for "Manuel Rivera".

15         e.   I have not yet received information regarding mailbox
16  number 327 in the name of Randy Perez from Bizzy Box located at 16060
17  Ventura Blvd #110, Encino or regarding mailbox number 497 in the name
18  of Carlos Gomez from Brentwood Mailbox Center located at 11693 San
19  Vicente Blvd., Los Angeles.

20     24.   Found on one of PAULINO's cellular phones was an app called
21  AirPay. Linked to this AirPay app was a Visa credit card number
22  ending in X9718. I received documentation from Bancorp Bank that the
23  account ending in X9718 belonged to an individual hereby identified
24  as "T.F.". Bancorp Bank's documents further indicated the T.F. had
25  reported his credit card stolen in January 2017 due to charges
26  exceeding $12,000 which had not been authorized by T.F.

27     25.   Also found on PAULINO's phones was evidence that PAULINO
28  was utilizing encrypted third party apps, such as ICQ and Telegram to

communicate with co-conspirators about his fraud.  Examples of these communications are summarized below:

a.   PAULINO communicated with an individual identified by the user name "Julio Reyes" and ICQ number 682-435-578 about stolen credit card numbers among other things.  In many of these communications, Reyes sent PAULINO batches of credit/debit card account numbers, card holder names, account usernames, passwords and other PII.  Between May 1, 2017 and January 16, 2019, Reyes sent PAULINO approximately 150 credit/debit card account numbers with cardholder names, expiration dates, and CCV numbers.  Reyes also sent PAULINO five different 30+ alpha numeric strings which appear to be Bitcoin wallet addresses.

b.   PAULINO communicated with an individual identified by the user name "Gmunna" and ICQ number 516-474-4834 about stolen credit/debit card numbers and bank account profiles.  For example, on January 22, 2018, Gmunna sent PAULINO five names, debit card numbers and PINs ending in X6081, X7104, X2196, X3975 and X7730.  PAULINO then sent Gmunna photographs of ATM receipts which corresponded to the names and debit card numbers Gmunna provided showing that some of the cards worked while others did not.

c.   (I received documentation from U.S. Bank which showed the debit cards ending in X6081 and X7104 referred to above actually belonged to individuals hereby identified as "D.S." and "B.C." respectively.  Both D.S. and B.C. reported the accounts stolen due to more than $11,000 in charges which were unauthorized. I also received documentation from PNC Bank which showed the debit cards ending in X2196, X3975 and X7730 referred to above belonged to individuals

hereby identified as "M.P.", "E.H." and "A.S" respectively.  Further
information regarding these accounts has not yet been received.)

      d.   On January 24, 2018, Gmunna asked PAULINO how much it
cost to have a card re-encoded and PAULINO replied that he charged
$12 per card.  Gmunna sent PAULINO five different credit/debit card
numbers and asked PAULINO to re-encode them for the name Jerel
Washington Brown.

      e.   PAULINO communicated with an individual identified as
"PUN" on ICQ regarding stolen debit card accounts.  Between March
24, 2017 and March 14, 2018 PAULINO sent PUN more than 50 debit card
account numbers, most of which included a PIN number, too.  On March
24, 2017, PAULINO told PUN to "start 500$ swipe…after check cards at
atm that declined…when done send 60% share".

      f.   On August 17, 2017, PAULINO explained to PUN how the
proceeds are divided, "The plug get 60%, 10% goes to bit [Bitcoin],
10% to the worker…We only left with 20%".  On August 19, 2017,
PAULINO sent PUN a photograph of a Bitcoin transaction which showed
$8,176.18 was transferred to a Bitcoin wallet ending in "J5ddz7".

      g.   In September and October 2017, PAULINO sent PUN a
series of messages which indicate PAULINO was making re-encoded cards
himself.  For example, on September 16, 2017, PAULINO wrote, "cooked
up ones ending in 3268, 7009, 7521, 1695 for marv n his cuzin"; on
September 26, 2017, PAULINO wrote, "cooked up 8712, 5733, 4653" and
then "machine is down right now…gotta fix it"; and on September 30,
207, PAULINO wrote "cooked up 7898 and 7709".

      h.   PAULINO communicated with an entity identified by the
user name "san-wells" on Telegram about stolen identities as well as
credit/debit card information.  Open source information indicates

that san-wells is a market place operating on the deep web, or
darknet, which sells stolen credit/debit card information and
personal identifying information.  Messages received by PAULINO's
Telegram account from san-wells include advertisements of what
information is for sale.  For example, on January 24, 2019, PAULINO
received a message from "san-wells" on Telegram which read as
follows:

> **"Section: CC**
>
> **ID: 2029**
>
> **Name: Bank Account with CC + [SSN and DOB] + [Email Access]**
>
> **Seller: ComputerVirus (NEW)**
>
> **Section: Bank acc+Email Access**
>
> **ID: 2043**
>
> **Name: Chase.com + [Email Access] + [Full AN + RN]**
>
> **Seller: AquaMan**
>
> **Section: Payment Systems**
>
> **ID: 2048**
>
> **Name: Paypal.com [Email Access]**
>
> **Seller: AquaMan"**

        i.   PAULINO communicated with an individual identified as
"AmandaEDU" and ICQ number 656-201-519 about hacking AT&T and Verizon
accounts for the purpose of ordering iPhones and charging them to
victim accounts.  On December 5, 2018, AmandaEDU instructed PAULINO
to "start small…go in apple with pin and just upgrade to new iphone"
and "place upgrade over the phone…ship to any address".  AmandaEDU
told PAULINO that she has the items shipped to hotels where she can

pick them up.  AmandaEDU further tells PAULINO that "u gotta do quantity so u don't lose…like if I put out 20 phones…and only 5 land im not tripping cuz its 5k and I make my expenses back…really a numbers game…"

      j.   PAULINO also communicated with an individual on Telegram identified as "Diamond Dallas" about hacking AT&T accounts for the purpose of ordering iPhones and charging them to the victim accounts.  For example, on January 18, 2019, Dallas sent PAULINO five AT&T profiles including user name, email, account number and password.  Dallas told PAULINO to pay him $40 each for the profiles. Dallas described to PAULINO that he had 34 phones shipped to hotels "yesterday".

      k.   On January 19, 2019, Dallas wrote PAULINO that he was having "some packs [packages] landing out in LA today" and he asked if PAULINO could pick them up for him at a Radisson Suites in Buena Park.  PAULINO agreed and told Dallas to tell the hotel that "Roberto Diaz" was the person picking up the packages.  Later, PAULINO confirmed picking up the packages.

      l.   On January 24, 2019, PAULINO complained to Dallas that he "did 4 yesterday and only one got shipped…others cancelled". Dallas recommended that PAULINO try changing his "ip address", "logging on thru a hotspot" and "switch browser…. safari… chrome… Mozilla" to fix the problem.

      m.   PAULINO communicated with an individual identified as "SupeR" and ICQ number 690-764-805 about hacking Visa and Mastercard to conduct large scale heists.  For example, on August 11, 2018, SupeR tells PAULINO, "VERY IMPORTANT: you should get cash in atm maximum $3k from each pc, be sure not to get more than $3k from one

pc, otherwise you[r] area will get blocked and you'll be unable to cash out other pcs!!!" Later that day, SupeR asks PAULINO, "how are you? Why so long? We only have two hours left…need to make as much as possible for this time…" PAULINO responds that some of the cards were declined and he has tried other banks and ATMs, but the cards are not working. SupeR tells PAULINO, "We are finishing with visa for today and 15 hours from now we'll work with mc [Mastercard]…" and "this work is supposed to be done very fast to be able to get as much cash as possible…we can't hold it for long time cuz antifraud is acting fast…" PAULINO responds with "Ok got it, I will be ready in 15 hours".

n.    On August 20, 2018, SupeR writes PAULINO, "I have some work to try…in what state are you now?" PAULINO responds, "California". SupeR then tells PAULINO to "check balance in atm and try to pull 200-1000 till decline cuz banks are different and have different limits then you should swipe 500-990 till decline (same reason) better to start in am not to have a big pause between pull and swipe". PAULINO responds, "Ok so try them in the am 2morrow?" On August 21, 2018, PAULINO writes SupeR, "All 5 pcs unable to do transaction, I went to 3 different banks wells, bofa, and chase…"

## Facts Bearing on Flight Risk and Danger

26. PAULINO operates under false identities, namely, PAULINO utilizes at least three aliases Roberto Diaz, Manuel Rivera and George Rodriguez to send and receive mail. PAULINO has falsified driver's licenses for each of these three aliases. Furthermore, based upon information found in the "Notes" section of PAULINO's phones, it is likely that he also utilizes the aliases Carlos Gomez and Randy Perez.

27.  PAULINO told me he was born in the Dominican Republic and is a naturalized US Citizen.  I know that the Dominican Republic recognizes dual citizenship and therefore PAULINO would not have lost his Dominican Republic citizenship when he became a US citizen. During the search of PAULINO's APARTMENT by the LAPD, PAULINO's US passport was found, but a Dominican Republic passport was not located.

28.  PAULINO does not appear to take court appearances seriously.  PAULINO was scheduled to appear in state court in the case involving the re-encoded cards PAULINO possessed at Universal Studios at 8:30 AM on April 3, 2019, the same day the LAPD executed the search warrants on PAULINO's residence and vehicle.  For officer safety, LAPD Detectives hoped to execute the warrants after PAULINO left his apartment, and so waited for him to leave for his court appearance.  By 8:15am, it was clear that PAULINO would already have had to have left his apartment to have any possibility of making it to court on time, so the LAPD executed the search warrants and found PAULINO inside the residence.  When I interviewed PAULINO that day, I asked him why he did not make his court appearance that morning and he told me he did not know he had a court appearance that day.   I later learned from LAPD Detectives that PAULINO's failure to appear for court on April 3, 2019 resulted in a bench warrant being issued. However, PAULINO's attorney was able to have the bench warrant removed by claiming that PAULINO did not make the court appearance due to the search warrants executed by the LAPD.

29.  I reviewed records related to PAULINO's border crossings using his US passport which revealed that he traveled by plane to Los Cabos, Mexico from March 13-16, 2019 and to the Dominican Republic

16

from February 13-20, 2019.  In addition, on August 26, 2018, PAULINO traveled by car from Mexico to the US, entering at the San Ysidro border crossing.

30.  Text messages on PAULINO's phone revealed a group chat entitled "CIP NIP".  When I asked PAULINO what "CIP NIP" meant, he told me "Crip in Peace, Nipsey".  It appears, therefore, that PAULINO at least associates with gang members.

31.  PAULINO has no legitimate source of income.  PAULINO told me that he has not been employed for four years and had no source of income.  Despite this, approximately $86,000 was found in cash in his residence.  Based upon PAULINO's own admission, he transfers 80% of his criminal proceeds to his co-conspirators and only keeps 20%.  Furthermore, PAULINO told me that he both sends and receives criminal proceeds via Bitcoin.  Based upon my training and experience, criminals only keep a portion of their cash in their residences as it is more likely to be stolen by other criminals or seized by the government.  Therefore, I believe the cash found in PAULINO's residence was only a small portion of his available cash.  Based upon the fact that PAULINO admitted to using Bitcoin and the fact that apps related to Bitcoin and Ether (another crypto-currency similar to Bitcoin) were found on PAULINO's phones, I believe that PAULINO has access to large sums of money which are difficult to trace.

## Evidence of Money Laundering Will Likely Be Found
## Despite the Earlier Search Warrants

32.  The search warrants executed on PAULINO'S APARTMENT and PAULINO'S VEHICLE on April 3, 2019, yielded much evidence of the fraud scheme, as previously recounted.  Notwithstanding those searches, I believe additional evidence of the scheme, and of the

laundering of its proceeds, will be found at those same locations for the following reasons:

a. PAULINO told me that he has not had any legitimate employment for the last four years. Further, the LAPD took his stash of $86,000 in cash during their April 3, 2019 search. Because he has no legitimate income and the LAPD took his stash of cash, PAULINO will be under pressure to generate money for living expenses. Given his history of fraud, including his history of committing fraud while on bond in another fraud case, I think it is very likely that he will return to what he knows to generate money quickly: buying and selling stolen access device numbers and personal identifying information, and negotiating money orders and similar checks which represent the proceeds of such frauds.

b. Even if PAULINO decided not to commit new crimes and found a legitimate source of income, the messages on his digital devices suggest that he would still need to communicate with his co-conspirators just to end the deals he had previously negotiated. For example, I found communications regarding tasks PAULINO was supposed to perform for his co-conspirators and vice versa, as well as ones regarding dividing up the proceeds. In my training and experience, criminals with many contacts value those contacts—and their reputations—and so are likely to try to honor pre-existing obligations, collect or pay outstanding debts, and explain why they have been incommunicado or warn their co-conspirators of an investigation.

c. PAULINO's Bitcoin, or other crypto-currency has not yet been located or seized by the LAPD or FBI. Bitcoin exist as entries in a ledger on the blockchain. Most Bitcoin users set up

their accounts so that they can access them even if their digital device fails or is stolen. I believe it is very likely, therefore, that PAULINO will attempt to access the Bitcoin he had when we executed the search. Such access would require a digital device, which he would likely keep with him, such as a smart phone, or keep in his car or his residence, such as a computer. PAULINO's attempt to move the proceeds of his fraud which are stored as Bitcoin would constitute and be evidence of money laundering.

d. PAULINO appears to have returned to PAULINO'S APARTMENT in PAULINO'S VEHICLE. PAULINO'S APARTMENT costs more than $2000 per month, according to the management of the Orsini complex. Notwithstanding this expense, PAULINO appeared not to use PAULINO'S APARTMENT for weeks after the April 3, 2019 search warrant, possibly because he feared arrest; Detective Shinfeld told me he repeatedly went by PAULINO'S APARTMENT but saw no vehicle in its assigned parking space. However, on April 29, 2019, Detective Shinfeld saw that PAULINO'S VEHICLE was back in the assigned space for PAULINO'S APARTMENT, so it appears that PAULINO has returned to his apartment. Detective Shinfeld told me that he learned from management at the Orsini apartment complex that PAULINO paid his May rent with a money order, suggesting he may still be receiving proceeds of the bank fraud conspiracy in that form.

**Training and Experience Regarding Fraud:**

33. Individuals involved in identity theft schemes like this one must keep evidence of their schemes, such contact information for their co-conspirators, lists of victim information and accounts used in the scheme, simply to keep the scheme going. Much of this

19

evidence is now stored on digital devices such as computers and smartphones.

34.   Specifically, information found on PAULINO's phones indicate he utilizes access devices and accounts in other identities as well as crypto-currency.   Furthermore, PAULINO's communication with co-conspirators using encrypted apps also referenced the use of the deep web or dark net which is commonly accessed on digital devices through a "TOR" (The Onion Ring) browser.   For example, on January 18, 2019 using Telegram, PAULINO told an individual identified as "Laurent" to "download tor browser".   I know from my training and experience that a TOR browser allows an individual to search the deep web or dark net anonymously.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

35.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the

1   forensic examination of digital devices, I know that data in digital
2   form can be stored on a variety of digital devices and that during
3   the search of a premises it is not always possible to search digital
4   devices for digital data for a number of reasons, including the
5   following:

6        a.   Searching digital devices can be a highly technical
7   process that requires specific expertise and specialized equipment.
8   There are so many types of digital devices and software programs in
9   use today that it is impossible to bring to the search site all of
10  the necessary technical manuals and specialized equipment necessary
11  to conduct a thorough search.  In addition, it may be necessary to
12  consult with specially trained personnel who have specific expertise
13  in the types of digital devices, operating systems, or software
14  applications that are being searched.

15       b.   Digital data is particularly vulnerable to inadvertent
16  or intentional modification or destruction.  Searching digital
17  devices can require the use of precise, scientific procedures that
18  are designed to maintain the integrity of digital data and to recover
19  "hidden," erased, compressed, encrypted, or password-protected data.
20  As a result, a controlled environment, such as a law enforcement
21  laboratory or similar facility, is essential to conducting a complete
22  and accurate analysis of data stored on digital devices.

23       c.   The volume of data stored on many digital devices will
24  typically be so large that it will be highly impractical to search
25  for data during the physical search of the premises.  A single
26  megabyte of storage space is the equivalent of 500 double-spaced
27  pages of text.  A single gigabyte of storage space, or 1,000
28  megabytes, is the equivalent of 500,000 double-spaced pages of text.

21

Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[1] Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced

---

[1] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

with more recently downloaded or viewed content.  Thus, the ability
to retrieve residue of an electronic file from a hard drive depends
less on when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive requires
specialized tools and a controlled laboratory environment.  Recovery
also can require substantial time.

        e.    Although some of the records called for by this
warrant might be found in the form of user-generated documents (such
as word processing, picture, and movie files), digital devices can
contain other forms of electronic evidence as well.  In particular,
records of how a digital device has been used, what it has been used
for, who has used it, and who has been responsible for creating or
maintaining records, documents, programs, applications and materials
contained on the digital devices are, as described further in the
attachments, called for by this warrant.  Those records will not
always be found in digital data that is neatly segregable from the
hard drive image as a whole.  Digital data on the hard drive not
currently associated with any file can provide evidence of a file
that was once on the hard drive but has since been deleted or edited,
or of a deleted portion of a file (such as a paragraph that has been
deleted from a word processing file).  Virtual memory paging systems
can leave digital data on the hard drive that show what tasks and
processes on the computer were recently used.  Web browsers, e-mail
programs, and chat programs often store configuration data on the
hard drive that can reveal information such as online nicknames and
passwords.  Operating systems can record additional data, such as the
attachment of peripherals, the attachment of USB flash storage

23

devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is

24

1  necessary to decrypt the data into readable form.  In addition,
2  digital device users can conceal data within another seemingly
3  unrelated and innocuous file in a process called "steganography."
4  For example, by using steganography a digital device user can conceal
5  text in an image file that cannot be viewed when the image file is
6  opened.  Digital devices may also contain "booby traps" that destroy
7  or alter data if certain procedures are not scrupulously followed.  A
8  substantial amount of time is necessary to extract and sort through
9  data that is concealed, encrypted, or subject to booby traps, to
10  determine whether it is evidence, contraband or instrumentalities of
11  a crime.  In addition, decryption of devices and data stored thereon
12  is a constantly evolving field, and law enforcement agencies
13  continuously develop or acquire new methods of decryption, even for
14  devices or data that cannot currently be decrypted.

15  **Request to Use Biometric Features to Unlock Digital Devices**

16          36.  Based on my training and experience, and knowledge of this
17  investigation as discussed previously, I believe that digital
18  devices, such as smartphones, will be found during the search.

19          a.  I know from my training and experience and my review
20  of publicly available materials that several hardware and software
21  manufacturers offer their users the ability to unlock their devices
22  through biometric features in lieu of a numeric or alphanumeric
23  passcode or password.  These biometric features include fingerprint-
24  recognition, face-recognition, iris-recognition, and retina-
25  recognition.  Some devices offer a combination of these biometric
26  features and enable the users of such devices to select which
27  features they would like to utilize.

28

b.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID.  Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

c.    If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  To activate the facial-recognition feature, a user must hold the device in front of his or her face.  The device's camera analyzes and records data based on the user's facial characteristics.  The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face.  No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera

26

1    is often essential to the proper functioning of these facial-

2    recognition features; thus, a user must have his or her eyes open

3    during the biometric scan (unless the user previously disabled this

4    requirement).  Several companies produce digital devices equipped

5    with a facial-recognition–unlock feature, and all work in a similar

6    manner with different degrees of sophistication, e.g., Samsung's

7    Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017),

8    Apple's iPhone X (released Fall 2017).  Apple calls its facial-

9    recognition unlock feature "Face ID."  The scan and unlock process

10    for Face ID is almost instantaneous, occurring in approximately one

11    second.

12         d.    While not as prolific on digital devices as

13    fingerprint- and facial-recognition features, both iris- and retina-

14    scanning features exist for securing devices/data.  The human iris,

15    like a fingerprint, contains complex patterns that are unique and

16    stable.  Iris-recognition technology uses mathematical pattern-

17    recognition techniques to map the iris using infrared light.

18    Similarly, retina scanning casts infrared light into a person's eye

19    to map the unique variations of a person's retinal blood vessels.  A

20    user can register one or both eyes to be used to unlock a device with

21    these features.  To activate the feature, the user holds the device

22    in front of his or her face while the device directs an infrared

23    light toward the user's face and activates an infrared-sensitive

24    camera to record data from the person's eyes.  The device is then

25    unlocked if the camera detects the registered eye.  Both the Samsung

26    Galaxy S8 and Note 8 (discussed above) have iris-recognition

27    features.  In addition, Microsoft has a product called "Windows

28    Hello" that provides users with a suite of biometric features

including fingerprint-, facial-, and iris-unlock features. Windows Hello has both a software and hardware component, and multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

37. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

38. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled. This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time. For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button. Biometric features from other brands carry similar restrictions. Thus, in the event law

enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.   I do not know the passcodes of the devices likely to be found during the search.

39.   In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features (such as with Touch ID devices, which can be registered with up to five fingerprints), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.   Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.   Thus, it will likely be necessary for law enforcement to have the ability to require any individual who is found at the SUBJECT PREMISES and reasonably believed by law enforcement to be a user of the device to unlock the device using biometric features in the same manner as discussed in the following paragraph.

40.   For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the SUBJECT PREMISES during the

execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is (a) located at the SUBJECT PREMISES and (b) falls within the scope of the warrant: (1) compel the use of the person's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.  With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

41.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### Federal Insurance

42.    In my training and experience, all credit cards issued in the United States are issued by federally insured financial institutions.  Further, in my training and experience all the financial institutions mentioned in this affidavit are federally insured.

///

**CONCLUSION**

43.   Based upon the foregoing facts and my training and
experience, I believe there is probable cause to believe that PAULINO
conspired to commit bank fraud and committed aggravated identity
theft in violation of Title 18, United States Code, Sections 1349 and
1028A, and that evidence of the violations listed in Attachment B
will be found at the SUBJECT PREMISES.

/S/
_____
Sherine D. Ebadi, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this ___8___ day of May, 2019.

JOHN E. McDERMOTT
_____
UNITED STATES MAGISTRATE JUDGE

31